May it please the Court, I'm Eric Multop, appearing on behalf of Royal Kenneth Hayes, my esteemed client of some 15 years. Mr. Hayes' objective in this litigation is to have an impartial tribunal review the reasonableness of the California Supreme Court's affirmance of his death judgment. To facilitate this review, he asked me to appear today to respond to any questions the Court has about the claims raised in the briefs, and otherwise to submit the matter for the Court's determination. I have independently reviewed the briefs, have no additional points to argue or authorities to cite. And let me ask you to turn to what I believe is the fourth argument presented in your brief regarding the Confrontation Clause challenge based upon the refusal to call Debbie Garcia's attorney and set aside the privilege claim, and ask if you could explain to me just how it is that's a Confrontation Clause violation. And I don't understand that Ms. Garcia's cross-examination was limited in any fashion in terms of what questions could be asked or in what she responded to. And so I understand how the same factual scenario has led to a due process argument with regard to the prosecution's use of her alleged uninvolvement or disconcern about her own future, and she wasn't asking for immunity and all that. But I really don't conceptually understand how it is a Confrontation Clause violation for a defendant not to be allowed to inquire of another witness and get information about another witness about what he did and understood. Yes. I understand the Court's question. And the argument is captioned in terms of a violation of two constitutional rights, one of confrontation and the other of a right to present an affirmative defense. Was that raised by you in your brief? It certainly is, Your Honor. I'm looking at the caption to argument 4 that the appellant was deprived of his Federal constitutional rights of confrontation and to present defense evidence were violated. Was that raised before the State court? I feel certain it was, because ---- How about can you cite me to any record citation of it being raised before the State court? Your Honor, I don't have the opening brief in the automatic appeal in front of me right now, but that is a matter of the record lodged with this Court, and that would provide a dispositive answer to the question. Would you agree that if it's not in your opening brief on the automatic appeal, the due process argument, leaving Confrontation Clause to one side, it would be improper for you to raise it here? Your Honor, there are no 5th-slash-14th Amendment due process aspect to this argument. It's two facets of the Sixth Amendment argument, the confrontation of a witness and the right to present a defense. And the Sixth Amendment claims were raised throughout. You're saying that the Confrontation Clause argument has as a necessary appendage to it the right to present evidence in confrontation? Yes, Your Honor. Well, but then answer Judge Clifson's argument. How does ---- how was Garcia not confronted? Her false testimony was allowed to stand in front of the jury because the defense was precluded from calling her lawyer who would have provided contrary defense. But that's calling another witness. It's not confronting Garcia. That's right. That's the ---- there's two sides of the Sixth Amendment, two components. Do you have any cases that say that a part of the right of confrontation under the Sixth Amendment includes the presentation of rebuttal testimony? This is an AEDPA case. We have to have a clear statement by the Supreme Court of the United States that a violation of the Constitution has occurred in your client's case. Would you please cite me any case that says that the right to present rebutting testimony is part and parcel of the right to confront a witness? With pleasure, Your Honor. And that would be the case cited at page 9 of our opening brief here, Olden v. Kentucky, 488 U.S. 227. And that case, in that case the Supreme Court discussed the two aspects of the Sixth Amendment, including the ---- in reverse, because of the exclusion of rebuttal evidence that would have impeached the prosecution's primary witness, which is exactly the context that we are claiming we're deprived of by the trial court's ruling here. What were the facts in Olden v. Kentucky? Okay. The defendant was charged with rape and defended on the basis of consent. Excluded from the defense presentation was testimony that the complaining witness had told her boyfriend, her actual boyfriend, longstanding boyfriend, that she had been sexually assaulted by the defendant in order to hide or failed to not disclose the fact that she voluntarily had sexual relations with a person of a different race. Was that based on a limitation on the cross-examination of the victim? No. It was based on a limitation on the defendant's ability to present extrinsic evidence of her domestic situation and her motive to falsely accuse the defendant of rape. Counsel, if they allowed them to call counsel, would his testimony have been limited to the issue of the advice he gave on immunity? No. It would the primary focus of his testimony would have been to directly contradict Debbie Garcia's testimony that I'm here as a good citizen, independent witness, and to directly rebut the prosecutor's argument that Debbie Garcia had no motive to lie in relation to Mr. Hayes. And his testimony, because Debbie Garcia testified that I never asked for immunity, I never asked for anything from the prosecution whatsoever, and I never authorized anybody to ask for immunity, the lawyer would have testified that the first thing Debbie Garcia said when he mentioned the possibility of immunity is, you go to the district attorney and get me some immunity. That would have been the lawyer's testimony. How would that be? That's really, you're agreeing with me that the testimony would be limited to the issue of how the immunity was requested and granted. Phrased that way, I totally entirely agree with the Court's characterization of that. The unusual set of circumstances, if there's some insight into what the attorney would have said because of the happenstance of who he called, and it may be that we just have to make some assumptions. But when I read what's related by, and I'm now afraid I'm confused, by the person he called, the lawyer he called, his name I'm now blanking on. Breyer, I really don't get that same impression, because it seems to me that the attorney is being educated by another lawyer as to what needs to be done. And you're proposing or suggesting that his testimony would have, in essence, said his client told him, this is what I need to get. Does one lead to the other? Your Honor, I believe I understand the point of the Court's question. And the situation developed in the following manner. Debbie Garcia contacted Brad Wiles, who was not an experienced criminal defense lawyer in Santa Cruz County, but he was a lawyer and was a high school classmate or something. I forgot what the connection was. Yes, that's right. So he contacted an attorney named Larry Bigum, who was one of the most experienced trial lawyers, criminal defense lawyers in the county, who gave him very specific directions about what to do on behalf of this particular client. So that brought Brad Wiles up to speed about how to frame the conversation with his client, Debbie Garcia. He went to her and said, here are the possibilities for you and your situation. What do you want me to do? And she said, I want you to go get me immunity, after hearing him present her opportunities. This is an unusual case, Your Honor, where there is an offer of proof as to the content of substance of Brad Wiles' testimony, had he been called, in the trial record. And so we do know that he would have directly contradicted her trial testimony that she never asked for, never sought, never authorized anybody to seek immunity or any other benefit on her part. Counsel, one of the major arguments is that change of venue should have been granted  What happened was that, yes, they found your defendant guilty, but they refused to impose the death penalty. Does that suggest that there was success in impaneling an impartial jury? And is that the test? Your Honor, that's an intriguing question from a different perspective than we've addressed so far. The guarantee of Shepard v. Maxwell is to have a fair jury from an unpainted jury pool with respect to the adjudication of guilt. Now, it's entirely possible that the citizens of Santa Cruz County could have been sufficiently inflamed by its then reputation as the murder capital of the world, where heinous criminals were flocking to the mountains of Santa Cruz County, committing horrendous acts and draining the public coffers. This was a major issue at the time of the Hayes trial, where the jurors could have been biased in the sense of saying, we're going to convict this newest and most heinous murderer, send him away to prison for the rest of his life, and we don't really care about the death penalty. We're humane people here in Santa Cruz County, but we're darn sure going to put a stop to all this murder going on down here. So I don't see that there's any – in the context of the publicity that occurred, how it would likely play out in the minds of the people in Santa Cruz that the failure to put an end to the violence there, in any way, cures the harm from the – cures the denial of the change of venue. But your – and plus, Your Honor, the – there was a change of venue for the penalty trial. I understand that. So it wasn't as if the Santa Cruz County jurors personally expressed their leniency on that topic. Well, it is the case that the penalty phase, when it was tried the first time in Santa Cruz County, resulted in a hung jury. That's when the change of venue kicks in. It was in the other county. Was it Stanislaus? Yes, Your Honor. Stanislaus County, which presumably isn't affected by the pretrial publicity. That's where the penalty phase resulted in the capital sentence. Well, that's entirely true. And the change of venue argument relates only to the validity of the murder convictions. Let me ask you, if I could, about the – what I believe is the third issue with regard to the testimony by Ms. Weller, when she volunteered, that she understood she was the target of a murder-for-hire plot by the defendant. And in particular, what you would identify as the Supreme Court decision that you believe that most gives us guidance or clearly establishes Federal law for the purposes of the challenge that you've posed? Your Honor, the Supreme Court decision that we're citing as most directly relevant to this issue is Bruton v. United States, relating to the inadmissibility of hearsay evidence from a co-defendant that's prejudicial to the defendant on trial. The quote from Bruton that applies here is that certain kinds of hearsay are at once so damaging, so suspect, and yet so difficult to discount, the jurors cannot be trusted to give such evidence the minimal weight it logically deserves, whatever jury, whatever instructions the trial judge just might give. And here we have Weller testifying that Sondra Johnson told her that Hayes had arranged for a contract hit on her from within the bowels of the Santa Cruz County Jail. Now, this is the type of extremely prejudicial hearsay that a jury would find very difficult to discount and would emphasize unfairly, because of its unreliable nature, the portrait of Hayes as a dangerous gangster-type person based on the hearsay of an otherwise involved and biased witness. Wasn't there an objection sustained to this answer immediately? And wasn't the jury instructed not to consider this? Well, it was, Your Honor. And is that the same situation in Bruton? Your Honor, the passage from Bruton that I just ---- I thought that in Bruton's case, the co-defendant's admission came in. It came in. Yes. Here, the volunteered statement of Weller was objected to. Objection was sustained. The jury was instructed not to consider it. And in the pattern instructions at the end of the case, the jury again was instructed not to consider anything that's not in evidence. Do you think that that, Bruton, applies here? Well, the passage from Bruton that I cited ---- But the passage from Bruton is on different facts. Your Honor, I certainly concede that. And our position is that the exposure to the jury of this imputation ---- Pardon me. The motion of this trial was made immediately and denied because of the instruction given. Yes, Your Honor. And so our position is that this is one of those instances recognized in Bruton that the jurors cannot be trusted to have given the evidence the minimal weight it logically deserved, whatever instructions the trial judge just might give. That's where we stand on that argument. On issue number 5, do you claim that the prosecution knew that Garcia was going to testify falsely about how immunity came out or came up and nonetheless put her on? Not necessarily, Your Honor. Our position is that this is governed by the Giglio case, where ---- which imposes upon the prosecutor a duty to correct false testimony after it arises. It's totally independent of any foreknowledge of anticipated perjury. But once the district attorney trying the case who had personally negotiated the immunity for her via Brad Wiles heard this testimony, the prosecutor was obligated to call a halt to the proceedings, convey to the defense that the prosecutor had independent personal knowledge that this was false testimony to enable the defense to impeach that testimony. What personal knowledge did the prosecutor have that it was false? That Brad Wiles came to her, to the prosecutor, authorized by Debbie Garcia to seek immunity for her, and that it was an affirmative defense, an affirmative effort on Debbie Garcia's part through her lawyer to obtain immunity, as opposed to Debbie Garcia, the jury, that this immunity came down like manna from heaven, unasked for, but perhaps welcome. Now, when she went to Wiles, what did she say her purpose was in going to him? I don't believe ---- what did she testify to? Yes. Just for some general assistance, general advice. So in that sense, her testimony might not be false when he said, well, we can suppose if there's any chance that you're involved in this hideous thing and the government wants you to testify, you better get some immunity for it. In that sense, then she would only be acting on the advice of Wiles to then say, okay, go ahead and try and get it. Okay. Your Honor, I'm going to cite you to ---- cite the Court to page 7372 and 7373 of the trial transcript, where Debbie Garcia was asked, do you recall whether or not it came from you or anyone hired by you, associated with you in any way, to ask for any kind of deal, bargain, benefit, anything other than protection? Answer categorically, quote, no, close quote. So she was asked, not only did you personally ask for immunity, but did anyone hired by you, associated with you in any way, ask for any kind of deal? And she knew very ---- She was actually asked if she recalled any of that. I mean, the questioning that leads up to that question, including that question and answers on page 40 of your opening brief, and she's busy answering, she doesn't remember much of anything. I mean, the immediately preceding question and answer is a question by the prosecutor, which I will say strikes me as implausible. Did I tell you I wouldn't let you testify without it, referring to immunity? And Garcia's answer is, I don't remember. I don't recall. The next question, do you recall whether or not, and it's as you've read, her answer, no. But frankly, when I read that, I read her saying she didn't recall much of anything about how that came to happen. Okay. She recalled at Rt. 7760, quoted on page 42, she recalled and expressly stated that she did not instruct Mr. Wiles to negotiate with the local district attorneys off to ensure that you get immunity in this case. She says, I did not. That is correct. There is a categorical answer that is not, where the question is not posed as to whether she recalled it. It's posed as to whether it happened or not. That, and Your Honor's view of the particular passage that I quoted one passage back is subject to that interpretation, whether it's a mere failure of recollection versus a denial that it occurred. But at the question that went on at Rt. 7760, there was a categorical denial that she instructed Wiles to negotiate. And while we're on that subject, your claim under Claim 5 is that the prosecutor knew that Garcia, through Wiles, had come to him and brought up the issue of immunity Yes, Your Honor. But the California Supreme Court found that the prosecutor, I think it's on ER 97, testified that Garcia appeared resistant to a grant of immunity because she felt she had committed no crime. If the last reason decision of the State court is to be unreasonable, because if it isn't unreasonable, then we have to go along with the California Supreme Court and not your view of what the evidence was. That particular passage in the California Supreme Court decision is not directly and does not directly address whether she instructed Wiles to get immunity for her. But it does reflect what the prosecutor said, and it shows that the prosecutor testified that the Garcia appeared resistant to a grant of immunity. That would imply that she hadn't sought it, right? Your Honor. Are you saying that she sought it but didn't want it? I'm saying that we have Debbie Garcia in a highly awkward position, aiding and abetting a couple of murders. And the scenario that the California Supreme Court is referring to relates to her personal position that, well, I didn't really do anything all that bad, so I don't think I need immunity. But at the same time, I'm covering my bases here, and I'm telling my lawyer to get me some immunity. Oh, this is a belt-and-suspenders argument. Belt-and-suspenders. I'm not familiar with the metaphor. Counsel, there's something about this case that is puzzling. Nowhere do you really challenge what happened at the penalty phase. And no argument was made that this man was incompetent. And yet in the petition for certiorari to the Supreme Court, there's kind of a circuitous reference to he had to be incompetent because he doesn't allow his counsel to go ahead with the only real viable defense, which is his incompetence. So there's proof of it in not going ahead with an incompetence claim. Is it your position that counsel must follow the defendant's advice in this matter, and even though counsel might think that his client was incompetent, that he still must follow the advice of the client? That's kind of a convoluted question, but I guess you get the gist of it. I do. Under California law, if an attorney has reason to believe his client is incompetent under Penal Code Section 1368, the attorney is obligated to raise that before the court. On an automatic appeal, there's a matter of issue selection which the client has a say, and I've been arguing capital appeals for 30 years, and I seriously take into consideration the client's wishes and position with respect to issue selection in the automatic appeal, and then particularly in Federal habeas corpus proceedings, in which the client has to authorize proceedings before they can occur, and to maintain that authorization throughout, the client's wishes have an even greater force and carry more weight with respect to issue selection and presentation of argument. And I hope that's responsive to your question. Well, we know that this guy, the reasons to think perhaps that this fellow might be incompetent, in one trial he was acquitted because of a finding that he was incompetent. And we have the facts here where you have a person chopping up the body and doing some things which might suggest that his conduct was not that of a rational person. But apparently, not at the trial level, not at the appeal level, direct appeal level, not in habeas, is this ever challenged? That's true, Your Honor. So that whether or not we have an incompetent individual, he can be executed if these other arguments aren't sustained. There's, of course, an Eighth Amendment preclusion to having an incompetent defendant executed, and that speaks to the time of execution. Yes. And so and I guess that issue could still potentially be challenged. On the surface, focusing now on either competence at the time of the crime, so it would be a potentially substantive defense to the crime, or competence at the time of trial with regard to ability to assist counsel, have either of those issues been addressed at any time in front of any court? Yes, Your Honor. The – in the automatic appeal, there – and I represented him on the automatic appeal – there was an issue relating to Mr. Hayes' individual motion for a new trial that he unreasonably interfered with his – the attorney's investigation and presentation of mitigation evidence. And that's where it was raised and that's where it was resolved. Do you recall that? Where would we find that? But that was on the penalty phase. Yes. Yes, Your Honor. Not on guilt. True. And that would be in – as I mentioned, I don't have the opening brief in the California Supreme Court with me, but that's where it would be found and it would – and I remember as of yesterday, arguing that particular point over at 350 McAllister Street a number of years ago, so. But it was raised never in the guilt phase. True. Okay. Unless there are further questions, we will give you time for rebuttal if there's need to respond to anything that the State offers us. Thank you, Your Honor. And we'll hear from the warden. May it please the Court. Lloyd Carter from the California Attorney General's Office for the Appellee. We agree with the Court. I will address the issues in the order that they were raised by counsel, the Claim No. 4, which involves Debbie Garcia. We agree with the Court's apparent conclusion here. This is not a confrontation issue. There was full and vigorous cross-examination of Ms. Garcia. Have you read the case of Olden v. Kentucky? No, Your Honor, I have not. But let me raise some – That's cited at page 9 of the brief, the blue brief. Thank you, Your Honor. Let me point out some things. First of all, we dispute strongly that Garcia lied on the stand about her immunity or that the prosecutor knowingly permitted this to occur. And I would like to refer the Court to page 97 of Appellant's Volume 2 Excerpts of Record, where it's the settled statement of the case that they put together for matters that had occurred off the record. In fact, the prosecutor corroborates virtually everything that Ms. Garcia testified to. Mrs. – Ms. Borris, who was the prosecutor, she said that Garcia, before ever talking to Ms. – And what proceeding is this in that she's testifying? This is in the State court appeal, in the California court of appeal, part of the record. And it's in your Excerpts of Record, Volume 2. Yeah. I undercut that citation.  But I wonder in what context she was testifying. This was the settled statement of – are you talking about the prosecutor? Yes. The prosecutor and the defense put together a settled statement of record in the State court, California court of appeal. And what the prosecutor says is that Garcia spoke repeatedly to law enforcement  She explained – the prosecutor explained to Garcia that, like it or not, she was going to require immunity before a judge would permit her to testify at preliminary examination and that the district attorney's office was granting her immunity. She said that the grant was long before Wiles ever came into the court and that the only thing that Wiles did to, quote, negotiate immunity was to make sure that the in-court grant by the court was done. Now, so, in fact, are we going to – what we had here with Garcia is a little trial within a trial, impeachment on a collateral matter. Secondly, even more troubling, if you turn to page 96 of the Excerpts of Record, this is the defense now. At line 6, Mr. Minsloff is the defense attorney. He says that he contacts Mr. Wiles, quote, before the trial, before the trial and finds out this information that supposedly Garcia was pressuring Wiles to get her a deal for immunity. Now, how is the privilege, attorney-client privilege, waived when Garcia had not yet testified? I think that the whole relationship between the defense attorney's partner, Mr. Biggum, and the contact with Wiles, I'm going to presume when Wiles, for the sake of discussion, when Wiles calls Biggum, he says, I'm representing a woman in a murder case. I would think that he would have told him that it was this killing where the two people were beheaded. Biggum, who is the partner of the defense attorney, should say, you know what? We're on the defense side. You're representing a prosecution witness. We don't even want to talk to you. But the undisputable point here is that the defense contact with Wiles occurred before anything that Garcia testified to would have caused a waiver of the attorney-client privilege. So now the question is, are there circumstances where you could override the attorney-client privilege in order to get a witness to testify? And I would suggest to the Court that a very useful case for us is Washington v. Texas. It's 388 U.S. 14. It was two young men who were involved in a killing, and the question was, who was the shooter? One of the co-defendants went to trial, was convicted, and then wanted to testify at the other guy's trial. The guy already in prison wanted to take the fall. Under Texas law at that time, this is the 60s, you were forbidden if another co-defendant had testified or had pled out or been found guilty, he could not come and testify at your trial, even though the prosecution could call. So the question that the United States Supreme Court was called upon to decide, and I'm quoting now from Washington v. Texas, We are thus called upon to decide whether the Sixth Amendment guarantees a defendant the right under any circumstances to put his witnesses on the stand, as well as the right to compel their attendance in court. I think that's right on the money of what we're talking about here today. Can he breach the attorney-client privilege to put this witness on to undermine Garcia's credibility? In Washington, what they ultimately decided was the young man could bring in the convicted co-defendant, but significantly, at the end of the opinion there, footnote 21, it says nothing in this opinion should be construed as disproving testimonial privileges such as the privilege against self-incrimination or the lawyer-client privilege. I am unaware of any Supreme Court's case which says that a defendant can breach the attorney-client privilege under these circumstances. Again, we strongly dispute that Garcia lied on the witness stand. She told the absolute truth. She's a layperson, and it's just we would submit that what's on page 96 of the excerpts of transcripts, excuse me, 97, are we going to — if we do, if we had allowed Mr. Wiles to testify, if I'm the prosecutor, I'm going to call Bigum, and I want to call — I want to have somebody interview me as the prosecutor to say, at any rate, what this boils down to is a long, dragged-out claim on a collateral issue which supposedly goes to Garcia's credibility. And I don't think there's any Supreme Court case that says that you can do that. I want to go briefly to change of venue unless there are more questions on that issue. I'm not hearing any. Let me just point out on the change of venue, this trial occurred two years and eight months after the crimes and the capture of the defendant. One of the things that the Shepard case said was that one of the things that a judge should do if he has an inflamed situation was let some time pass. And as we know from the record, at the time that the superior court arraignment, when the first change of venue motion was made, the judge said if I was going to start the trial tomorrow, I would grant a change of venue, but let's see what happens. So another 18 months rolls by. Now, at that time, and I see from the excerpts of record, that there's really only a couple of stories in the local newspapers, the Santa Cruz paper, and I think it was the San Jose Mercury News. And I read the coverage, and it was fairly straightforward of what was transpiring at the trial, at the start of the trial, the opening remarks. It does indeed mention his prior two acquittals on murder charges. But does it also mention that Weller passed a polygraph test? I think it did. I think it did. I can't remember if that was the story, but there was no question. And Weller was a prosecution attorney and had been granted immunity. Weller is a prosecution witness and had been granted immunity. Unlike Garcia, Weller had demanded immunity before she said anything. Now, what's also important is that in the closing argument ---- Well, don't you see that that has an inflammatory, prejudicial effect? I mean, the polygraph test would never come in on the trial. I agree. I agree. All those things should not have come on. But remember, in the jury pool, there was 320 people in the jury pool. By appellant's count, the judge dismissed 35 of those people for cause due to the pretrial publicity. Our count was 29. In either event, it's only about 10 percent of the jury pool. Now, the trial judge found that many of the jurors had moved to the county since the crimes had been committed. Many of them didn't know much about it at all. And even the Shepard case and Yount, which is the other case I'm relying on here, says that simply because jurors have heard about the case or might remember the defendant's first name, Royal, which was unusual, doesn't mean that they have developed fixed opinions such that they cannot get a fair trial, cannot be had. We would argue that the California standard for change of venue is much higher of, there are more criteria, more demanding criteria, than the United States Supreme Court guidance. But one thing that I did discover in Patent v. Yount was it said that habeas courts owe a special deference to a trial court's determination of whether an individual juror is impartial. So you do owe some deference to the trial judge who witnessed the jurors. And I don't think the claim here is of actual prejudice. It's presumed prejudice, isn't it? Well, I don't even know if there's any presumed prejudice on any of the actual seated jurors. I do know that the defense did not challenge a single one of the seated jurors for cause on the issue of publicity or a peremptory. You just got a hunch, maybe this person's been reading more than we know. So they left, which is what the California Supreme Court pointed out. Actually, during the trial, even, according to Justice Mosk, they were talking about the certain of the articles that were in the newspaper. So we had, at least during trial, we knew they were reading about it, and I'd be interested in your comments on the publicity that was renewed when the trial became close. Then people began to heat up and the press got active again. It seems to me that a close examination of those articles needs to be made. Well, there's only two of them, Your Honor, that counsel put into his excerpts of record. They're fairly brief articles. I would say they're not inflammatory. As regards to the allegation that jurors might have been reading the newspaper, that was made by one juror, as you know, and that was one of the issues in the California Supreme Court appeal. However, that's not been raised here. That's not an issue here. Counsel apparently thought so little of it that it was not raised. So we would say, in regards to when they wanted to renew, you could do that in any murder case, and when you have daily newspaper coverage, you could go out and poll the jury every day and ask them if they read the newspaper. The presumption here is that the jury followed the judge's instructions to avoid reading about the case. Was there radio and television publicity as the trial approached? Yes, I'm sure there was. I don't think it's anywhere remotely near the scale that occurred in Shepard, which is kind of the bench, the seminal case here. This wasn't a circus atmosphere. One thing that seems somewhat troubling about this case was that this was now the murder capital of the world, and they had the courts had transferred several cases, granted change of venue. And so the judge says, well, you know, I've got to consider costs here. I don't know whether I'm supposed to or not, but I'm going to. I think I have a right to. And to what extent did that influence his refusal to change the venue? Well, let's fairly characterize what the trial judge said here. As I remember his remarks, he said, you know, obviously all judges are concerned about controlling costs, but under no circumstances would he deny a change of venue, even based on cost, if he thought that the defendant could not get a fair trial in Santa Cruz County. Secondly, I think way too much is being made of this so-called murder capital of the world. One of the articles that I did read, which was very early on, remember the murders occurred in December of 1981 and the arrest of the suspects was in March. Now, he wasn't even arraigned in superior court till the following November. And there were some big newspaper articles. But what they made reference to, the so-called murder capital, there had been some murders in Santa Cruz County back in the 60s. But I don't know if in the early 80s people still referred to Santa Cruz County as the murder capital of the world. And this is kind of a thing that the press whips up and it's very trendy and stuff. But I think if you went and polled 100 people on the street in Santa Cruz about is this the murder capital of the world, I don't think that was an issue. And I certainly don't think that that there's any evidence in the record that that influenced any of the seated jurors in any way. I was thinking of it only in terms of the transfers of venue which were granted during that period. And the trial judge quite rightly said, it's just so costly, it's killing us. Well, the judge may have offered an offhand editorial comment, but he made it perfectly clear in the record that he would grant a change of venue if he thought, regardless of cost, if he thought the defendant could not get a fair trial. That's in the record. I can move to, if there are no further questions on that issue, argument three, which was the contract killing of Debbie Weller's comment about she thought there was a contract out on her. Well, one, backing up to the prior thing for one moment. Sure. There was some kind of an effort at a survey, and then it was said that it would cost $10,000 to survey enough people to figure out whether they knew about the trial and what effect it would have. And that survey was never done because nobody wanted to spring for $10,000. Well, I suspect that that was $10,000 well-saved, Your Honor. I'm not sure what a public opinion poll you've --- what the trial judge found as they were selecting the jury in this case was that there were many people in the jury pool who knew little or anything about the case. If they did know something about it, it was that there had been a murder and that the victims had been decapitated. And I believe a few of the jurors remembered the defendant's first name, Royal, which was unusual. But remember, even in the Shepard case, Anne Young, just because a prospective juror remembers having heard about a crime doesn't mean that they can't be impartial when they're in the jury box. And so, again, I think that pursuant to Young, this Court has to give some deference to the trial judge's determination. It's an issue of historical fact. The question in the Federal Habeas Corpus case is whether individual jurors have opinions that disqualify them. And the presumption of correctness due a State court's factual findings under 28 U.S. C.S. 2254d applies. So all we're asking is that this Court give the trial court some deference. And I think Appellant has failed in his burden to show a Supreme Court case which the ruling in this matter was contrary. to, or an unreasonable application of. Okay. I'd like to, if we're finished with that, I'd like to move to the contract killing and the supposed inflammatory influence on the jury. When Debbie Weller testified that she heard a con or there was a contract out for her, counsel made reference that this was in the Santa Cruz County jail. But I think what Weller was testifying to was when she was in jail in Minnesota. Which was where she was arrested. Anyway, I think you have to, and as the Justice pointed out, there was an objection. It was sustained, and the judge admonished the jury to strike that to your minds. Now, the question is, was that comment so inflammatory that the jury was hopelessly tainted? Well, I submit that on the record of this trial, where you had plenty of evidence that the defendant was threatening to have the mafia kill either Weller or Garcia, or Garcia's mother, Mrs. Edwards, who had no particular axe to grind in the murders. She testified that the appellant threatened to kill her and have her killed by the mafia. Now, I submit that when the jury's hearing of all, about all of this during the course of the trial. Many times, mafia killing, he claimed CIA could have people killed. In context, mention of a contract killing is hardly inflammatory. So I would say that the Oh, wait a minute. If you've got a witness saying this defendant's behind a contract killing, and it seems by definition that has to be inflammatory. It accuses the defendant on trial, both of being prepared to commit, quote, another close quote murder, and being so concerned about the witness's testimony that he would do something to try to prevent her from testifying. How could that not be prejudicial? Because the fact is, is that there was plenty of evidence that this defendant threatened to have witnesses and family members killed in mafia hits. Now, I think it's a reasonable inference that a mafia hit is a contract killing. And so the point is, whether you're going to have people killed in a contract hit, or whether you're going to string them up on a tree from a rope and hack their body to death while Weller or Garcia watches. And the specific threats of Edwards, who was Garcia's mother, testified that the appellant threatened to kill her or have the mafia kill her. And I would say that a very brief reference to a contract killing, which the objection is sustained, is not going to hopelessly inflame the jury that's been listening to weeks and weeks of testimony about how vicious this defendant was in threatening people, not in killing them himself, but in having them killed. So I would say that it wasn't inflammatory. Just briefly on the prosecutorial misconduct related to Garcia's false testimony, I would say Garcia did not testify falsely. She testified truthfully. The prosecutor corroborated her on virtually every detail, that Wiles didn't come into the picture until late, that Garcia's motivation in going to law enforcement in the first place was not to get immunity. In fact, the district attorney said she didn't want immunity. She was afraid for her life and the life of her family. So I think there's been no showing of prosecutorial misconduct here. Are there any other questions? The one issue covered in the appellant's briefs that is not discussed in the answering brief, that being the claim that, I'll just read the title of it, it's Issue 7 in the opening brief. Appellant has been deprived of the effective assistance of counsel and appellate due process by the unjustifiable delay in the State appellate proceedings. And is that addressed in the answering brief? Have I missed something? If it was, I apologize, Your Honor. I can only say that I don't believe that appellant cited to any Supreme Court precedent. If it was missed, it was inadvertent in an oversight, and I apologize. Well, is there anything you – I mean, it takes up something like four pages in the opening brief. It's mentioned in the reply brief as having not been the subject of any discussion in the answering brief. Is there anything more that you have to say to that issue? I would say that appellant has not, irrespective of whether we responded in the brief, I don't believe appellant has pointed to a single United States Supreme Court decision that said that undue delay in the State court proceedings is a constitutional violation. Sounds like there are no more questions, unless you have something further. Thank you, Your Honor. Thank you. Your Honor, it's readily apparent that my longstanding colleague and adversary, Mr. Carter, has a very different perspective on the inferences to be drawn from the record in the application of law to the issues raised. I feel that these differences of perspective have been clearly delineated in the briefs. And unless this Court has additional questions, I'm prepared to submit it. No questions. I do not hear any. We thank both counsel for your helpful arguments. The case just argued is submitted. That concludes our calendar for today. We're adjourned.
judges: Fletcher B. , Clifton, Bea